[No. 16035.  Department One.  February 7, 1921.]

THE STATE OF WASHINGTON, *on the Relation of Martha J. Deshler, Appellant,* v. E. H. DESHLER, *Respondent.*[1]

PARENT AND CHILD (3, 4)—CUSTODY—WELFARE OF CHILD—COMPETENCY OF PARENT.  Upon habeas corpus proceedings by a mother to obtain from the father the custody of a son eight years of age, the child's welfare is a primary consideration, and the discretion of the lower court in awarding the custody to the father will not be disturbed, where the evidence indicated an unusually close association between them and better school facilities and indicated that conditions could not be bettered by the change.

Appeal from a judgment of the superior court for Stevens county, Neal, J., entered October 27, 1919, upon findings in favor of the defendant, denying a writ of *habeas corpus* to obtain custody and possession of a minor child, after a trial to the court.  Affirmed.

*Zent & Jesseph,* for appellant.

*W. Lon Johnson* and *Wentz & Bailey,* for respondent.

PARKER, C. J.—This is a *habeas corpus* proceeding under Rem. Code, § 1064, commenced in the superior court for Stevens county, wherein the relator, Martha J. Deshler, seeks recovery from the defendant, E. H. Deshler, her husband, of the custody of their minor son, John Clark Deshler, who, at the time of the trial of the cause upon merits, was nearly eight

[1]Reported in 195 Pac. 226.

years old. The trial resulted in findings and a judgment reading as follows:

"It is ordered, adjudged and decreed and this does so order, adjudge and decree that the defendant, E. H. Deshler, be given and he hereby is awarded the custody and control of the minor, John Clark Deshler until the further order of this court, subject to provision herein stated.

"And it is further ordered, adjudged and decreed as follows:

"That the relator have the right at any and all times to visit said child at his home, and that she have the right to have the custody of said child on Saturday and Sunday in each week. When necessary, defendant to convey said boy to relator and return if within twelve miles of relator, the child's health permitting, and weather conditions being such as will permit said child safely and conveniently to leave his home and travel over the roads to the place of abode of relator, such right to continue so long as the relator shall remain in the state of Washington.

"That relator may have the custody of said boy if she so desires during summer school vacations at her own expense, and within Stevens county, and subject to visits by the father.

"That in case the relator returns to the state of Missouri, and thereafter elects to visit said child, that the defendant pay to the relator, once each year, in advance upon demand by mail, at such time as she elects to make such visit, the sum of $200 to defray her expenses on such visit from Missouri and return. Such visit to be made within twenty days after such payment by defendant.

"That such child shall not be removed from the state of Washington, except upon permission of the court had by order duly made upon hearing had after timely notice to the other party . . ."

From this disposition of the cause in the superior court, the relator has appealed to this court.

The controlling facts, as we view them, may be summarized as follows: Respondent and appellant are

husband and wife.   At the time of the trial in the
superior court in September, 1919, appellant was fifty-
one years old, while respondent was then forty-seven
years old.  They were married some twelve years prior
to that time.  Both of them had been twice married
before their marriage to each other.  Appellant had
several children by her former husband, all of whom
are now married and caring for themselves.  Respond-
ent has no children other than the minor son whose
custody is here in question.  Appellant and respond-
ent were both born in the state of Missouri.  He con-
tinued to make his home there until March, 1918.  She
continued to make her home there until April, 1919,
and may possibly be considered as maintaining her
residence there, even up to the present time, though,
as we proceed, that fact will appear to be somewhat
doubtful.

They seem to have considered their respective prop-
erty rights as separate by reason of the manner in
which they were acquired.  In any event, their re-
spective properties seem to have been so managed at
all times since their marriage.  Each seems to be well
able, so far as material possessions are concerned, to
care for this minor son.  Appellant's property is in
Missouri, while respondent's property is in Stevens
county in this state.  The married life of these people
has been attended by a lack of harmony of such a pro-
nounced character that it now seems that they have
both resolved to no longer live together, though they
have made no agreement to that effect.  To here re-
view in detail the causes of this lack of harmony and
their acts and words towards each other evidencing it,
would be but to unnecessarily relate a distressing
story.  In the spring of 1918 their relations had be-
come so strained that she gave him to understand that
she wished him to leave, saying to him, according to

his testimony: ''You go away and I hope I will never hear from you.'' Whether or not these were her exact words we need not decide, but the facts and circumstances disclosed by the evidence seem to us to show that this was then what she meant him to understand as her settled state of mind towards him. Nor can we think that she was justified in entertaining such a pronounced dislike for him, though we do not say that he was wholly blameless for the lack of harmony existing between them. This, we think, is as far as we need go touching the question of which one was most at fault in the bringing about their inharmonious relations, since this is not a question of divorce.

The evidence seems to show that the association of this young son with his father, respondent, had, at least for a year or two previous to that time, been more intimate than such association would ordinarily be between a father and a son of that age, in that respondent repeatedly took the son with him to his work in the fields and on trips to town, with a view of caring for the son at such times, thus relieving in a measure the mother from that degree of care and responsibility a mother would ordinarily have of a child of that age. This seems to have been done a great many times, not with the mere approval, but in compliance with the expressed wish of appellant, made seemingly to the end that she be not bothered with the care of the son at such times, and without any other reason therefor on her part. Respondent testified in part as follows:

''One morning she got mad when I was going horseback because I would not take him; she wanted me to take him; I says, I cannot take him today, and she says, you can; I says, if I take him I will take him and will not come back; she says, if you want to go, I never want to hear from you. During the time after he reached three years he was in my custody nearly

all the time. I took him with me when I went to work, where I was plowing on the farm a whole lot. I took him up to my brother's with me lots of times."

Respondent also testified that he asked appellant to go away with him and establish a new home, which she refused to do. On March 27, 1918, appellant and respondent were living upon her farm in Missouri, where they had resided for some years. On that day, while she was away from home visiting neighbors, respondent put the personal effects of himself and the son in his Ford automobile, and with the son drove away from their home with the intention of never returning. He left no word as to where he and the son were going. Indeed, he seems not to have had any very definite destination in view, though he then probably thought he would sooner or later meet his brother somewhere in the Northwest. Sometime later he and the son visited some of his brother's wife's people in Montana, where he worked for a while. Later, he and the son came to Stevens county in this state, where he and his brother acquired a ranch of considerable size and value, the title being taken in the brother's name, but in which the brother acknowledges that respondent has an interest. They are operating this ranch as partners. The brother testified that respondent's interest in the ranch, including the stock, is worth approximately twenty thousand dollars. They have, on the part of the ranch which seems to be regarded as respondent's, a well-built and equipped dwelling house worth four thousand five hundred dollars to five thousand dollars, in which the brother and his wife and their young son live. With them respondent and his son live as members of the family. It is plain from the evidence that the son is well cared for, both as to his physical and moral well-being, the brother's wife caring for him as a mother. There is a good public

school within a hundred and fifty yards of their home where school is in session nine months of the year, which the son attends at all times when school is in session. The testimony is very convincing that the son could hardly be better surrounded and provided for, apart from the one fact that he is not living with both of his parents under like favorable and harmonious conditions.

Appellant did not learn where respondent and the son were until in the spring of 1919, nearly a year after they left Missouri, though she apparently made considerable effort to find them. In April of that year, having learned that they had come to Stevens county, she came to Colville with a view of seeing and getting control of the son. Upon her arrival there, she procured an automobile and drove out to the Deshler ranch some eight miles north of Colville. Upon her arrival, there seemed to be some disposition on the part of respondent to prevent her seeing the son. However, she was permitted to visit with him, evidently as long as she desired to at that time, but did not attempt to take him away, apparently being given to understand that she could not do so. She returned the next day and visited with the son about an hour.

A few days later, she commenced this proceeding in the superior court for Stevens county. The record shows that she was by the superior court awarded temporary custody of the son during several different periods, of a week or so each, before the trial of the case, when she had him with her at Colville. She remained in Stevens county up until the time of the trial, which occurred September 25, 1919, five months after she came to Stevens county. Whether or not she intends to reside in Washington in the future, instead of in Missouri, is not made plain. In her testimony she says:

"My old home is in Mercer county, Missouri; it is the only home I have now, but I am living here in Stevens county, now. I am living with Mr. and Mrs. Butler. I am not employed by them. I have a room there; I am renting a room from them; I am paying for it, in money, by the month. I don't know whether I will return to Missouri; I don't know what I will do. I don't know as I would return to Missouri if this child is awarded to me."

At the conclusion of the trial, the son was taken by the trial judge into his chambers and examined in the presence of counsel for both appellant and respondent, but not under oath, appellant and respondent neither being present. That examination seems to show that there had not been instilled into his mind any ill will or prejudice towards either his father or mother. He said he liked them both, and he did not seem to realize that there were any serious differences between them. He plainly evidenced a desire to stay on the farm with his father, rather than go back with his mother, should that mean his going back to Missouri. This desire of the son is, of course, of slight consequence in view of the fact of his being only eight years old, but is not to be entirely ignored. While, as we have noticed, appellant is possessed of about as much property as respondent, we cannot bring ourselves to believe, in the light of the evidence, that her home in Missouri is surrounded with influences as conducive to the son's mental and moral welfare as is the home of respondent in this state. Her Missouri home is about one and one-half miles from the nearest school, where school is in session but six months of the year. Besides, there was an environment there for which one of appellant's grown sons seems largely responsible, which not only promoted unhappiness in their home, but also may well be regarded as detrimental to the son's moral welfare.

17—114 WASH.

We do not think it necessary to here review in detail the facts leading us to this conclusion. We would not want it understood that we deem appellant unfit morally for the care of this son; but, as between her and respondent, we are fully convinced that he, in so far as personal disposition and temperament are concerned, is as well, if not better, endowed than she is.

If this were a case of appellant's seeking to obtain the care and custody of this son as against a third person, we could readily hold that his welfare would not call for the award of his care and custody to such third person as against her. In such a case her parental right would turn the scale in her favor, in the absence of a very strong showing touching her unfitness. But we have no such case here. This is a controversy over the custody of this son between his parents, each of whom has, under ordinary circumstances, equal right to his care and control. There seems, then, but little, if anything, for us to here consider, other than the son's welfare.

Under the conditions as disclosed by this record at the time of the trial in the superior court—and we must view them as of that time—we cannot say that the trial court abused his discretion in leaving the son with respondent, the father, subject to the privileges of appellant, the mother, as specified in the court's judgment which is here on review. We do not want to be considered as condoning the acts of respondent in taking the son away from Missouri and bringing him to Washington, and his failure for a period of nearly a year thereafter to inform appellant of where he and the son were. This act of respondent would no doubt weigh against him in this controversy were we here called upon to decide only the rights of appellant and respondent as against each other, apart from the question of the son's welfare. But, the latter

being the controlling question to be decided, we cannot escape the conclusion that we would not be warranted in disturbing the judgment of the trial court.

If the son be left with respondent, under present conditions, and appellant should remain in Stevens county, and no divorce be sought by either appellant or respondent, of which there seems to be no indication at this time, it seems not wholly improbable that these people may again resume their marriage relations and found a new home together in this state, wherein both may have the full enjoyment of association with this young son. Such a desirable result we think is more likely to follow from the present disposition of this case than by granting to appellant all she here prays for.

The judgment is affirmed.

Holcomb, Mackintosh, and Bridges, JJ., concur.